All rise. The Illinois Assembly Court Division is now in session. I call Justice Jesse G. Reyes to the side. Morning, ladies and gentlemen. Morning, ladies and gentlemen. Morning. All right, I want to make sure everybody's awake. All right, please have a seat. And can we call the first case? Kevin Collinan v. Shevick Sales. With counsels who are going to argue this matter, please approach the podium. And please state your names for the record and the party that you're representing. Good morning, Your Honor. My name is Jamee Crockett, which I think I spelled that for you. It's J-A-I-M-E-E Crockett, C-R-O-C-K-E-T-T, and I'm the attorney for Shevick Sales Corporation. Okay. Good morning. John Madden for the Plaintiff Appellee. Kevin Collinan. Okay, great. Fifteen minutes apiece. Time for rebuttal. I would like ten and five, please. Ten and five? Okay. Sounds good. You may proceed. Thank you, Your Honor. May it please the Court. So we're here on three questions of review this morning, and I know that you've reviewed the briefs, but I'll just cover those very quickly. The first issue presented for review is whether the trial court properly interpreted and applied the Illinois Sales Representative Act. Second is whether the trial court ruled correctly on the plaintiff's breach of contract claim. And the third is whether the court's award of statutory damages under the Sales Act was warranted or excessive. Do we have an agreement here? Do we have a contract between the parties? The court found that there was a contract, yes. That's not what I'm asking. Do we have a contract? Yes. Do we have a contract? Yes. All right. And how do you find that there's a contract here? Well, as the court determined, well, there's no question. There's three different time periods or two different time periods of issue here. In September of 2017, SSC and the plaintiff engaged in conversations where they did agree to bring him on board as a sales representative for the company. And are these the e-mails? Those are the two e-mails that were Exhibit A to the complaint. And I believe that those were in September of 2017, where they were going back and forth about what the terms of payment were going to be when he came on board. And you agree that's a contract? I do. There wasn't an offer? Yes. And an acceptance and consideration. Correct. And we referred to it during trial, SSC, as it was two different agreements. The court didn't agree and found that it was one contract that was modified in the middle. So with regard to the engagement from September of 2017 until the plaintiff was fired on March 18th of 2018, there's no question that that was a contract. He was brought on board to make sales for the company. He was a sales representative as defined in the act under that agreement. SSC's position at trial was that when they fired the plaintiff on March 18th of 2018, that that contract ended, that the plaintiff had been fired, and that the parties separated ways. But isn't there an argument that the e-mails really didn't indicate that there was a contract because all the terms weren't definite? It was a work in progress, let's say. That's what my client argued, yes, was that there were question marks in there. There were terms, TBD, that the – Which were in the first contract. During the first contract, yes. But which one was the first contract? Yeah, so I'm referring to the September 2017 agreement, the two e-mails that were Exhibit A. So there were terms, TBD, in there, like was he going to be paid and what percentage, if and when he retired. There was questions about which products would or wouldn't be covered. But ultimately – So couldn't we interpret that as negotiations? Not necessarily a contract in full existence, but in terms of negotiating? Certainly. To the point you made. We actually argued that in the alternative in our appeal, was that it wasn't sufficient enough terms to be considered a contract. That's not what the court held, so I'm trying to play both sides here. But, so, the September 2017 contract, SSC's position was that was terminated when they fired the plaintiff in March of 2018. A couple of weeks later, the plaintiff wrote the e-mails which were Exhibit B to the complaint, which he titled separation agreement. Which we contended was a separate and apart agreement. Stating, you know, this is a gentleman's agreement. I want to know where my – where compensation is going to stand. He was very concerned about his – whether he was going to be paid going forward. The position that the plaintiff took at trial was that there was a contract formed in September of 2017. He was not fired in March of 2018. Rather – I love the way you put this. He accepted SSC's offer to no longer perform work for the company in exchange for taking less money. Which he supposedly accepted in April of 2018 by leaving the company and making no further sales in exchange for the commissions that were discussed in the April 2018 e-mails. Well, does he agree that demunition of a commission could be consideration for the modified contract? The definition of commission? The demunition. Oh, demunition. Yes, of the commission. I understand. Yes. That's consideration. It could be consideration, yes. But when looking at – Or an offer not to hire a lawyer. That could be consideration as well. Certainly. I mean, what did I say? A grain of sand. You know, it's very minuscule. We did argue that that wasn't sufficient consideration. The court did rule against us on that. But the law in Illinois is when you modify a contract, it has to have all the hallmarks of an originally formed contract. You have to have offer, acceptance, and consideration. So let's look at what those are. So the offer, according to the plaintiff, was SSC said we don't want you selling our products anymore, please go away. Which he accepted by saying I will not sell your products anymore. And then the consideration was in exchange for me doing no work for you, I will take these lesser commission payments. So those are the terms of the new contract. So at that point, and we argued this at trial and I think it's a huge error by the judge, that's not a contract. The modified contract is not governed by the Illinois Sales Representative Act. It is not a contract where sales are contemplated. If anything, so put it this way. But the sales representative act contemplates commissions, right? It does contemplate commissions, but commissions are defined as amounts coming from a principal, and that is a defined term, to a sales representative, and that is a defined term, for services, for sales that are being undertaken. So if you're still getting commissions, it's because of your capacity as a sales rep. You're still getting commissions after you've been terminated. Well, otherwise, wouldn't that turn the entire act on its head? No, and here's why. The plaintiff admitted, and we've cited his testimony in our papers, that for every sale he made while he was working for the company, he was paid. He was paid after he left, or after he was fired in March, he was paid for every sale he made before then. Any sale that happened after he left was not certain. It was not for any work he did. It was completely hypothetical. There could have been no sales. He was doing no work for the company. So just to clarify one thing, though, whether or not we have a contract here or not, there's one thing that I know that's not in the record, which is concerning, is that there was no termination date, right? There was no termination. All right, so that means he's at will. Correct. Well. Right? Yes. Right? So that means that the contract could be terminated at any time, right? If he's at will? If they're not satisfied with the performance? So the plaintiff's position at trial, which the court seemed to subscribe to, and they argued this, was that the original 2017 agreement entitled the plaintiff to commissions in perpetuity, basically for the rest of his life, the second he came on board with the company. That's contrary to a lot of testimony that was in the record, but that was the position that they took, was that because the plaintiff left his prior job and came to work for SSC, and the contract said this is what I'll pay you for year one and year two in retirement TBD, that at that point when he came on board, this was a contract for the rest of his life, and they argued at trial that it could not be unilaterally modified by SSC. And the judge did touch on that during his ruling. He said, yeah, you know, they took the position that this was a contract in perpetuity, but that it was modified. He kind of skirted that issue. Okay. But the law in Illinois is if, and we cited this in our reply brief, I believe, that if two parties make a contract where one of the conditions is it's not unilaterally exitable by either party, the law construes that as a contract at will, which is why SSC argued at trial that the September 2017 contract terminated when it fired the plaintiff. And at that point, there's no question the plaintiff admitted it. He was not owed any commissions for any work he had done for the company at that point, and as of the date of his termination, he was paid all commissions for all the sales that he made. Okay. Yet the company kept paying him commissions. Well, pursuant to the conversations and the e-mails that were exchanged after his termination, which the plaintiff titled those e-mails separation agreement, and asked for ongoing payments, and SSC testified that, you know, they're not monsters. They wanted to give him a soft landing, and they were going to continue to pay him commissions and a little bit of, like, buffer payments till, you know, as a thank you. So isn't that a change or modification as opposed to a total cutoff termination? That's what the court found, is that was a modification of the contract. But, again, the terms of that modification were, you are no longer selling for me. I don't want you selling for me. He agreed not to sell anymore and to go his separate ways. Indeed, in April of 2018. What about that doesn't make it a modification? Like, where do you draw the line between a straight termination and a modification? Well, the judge agreed with the plaintiff that it was a modification. Where do you stand on it? Our position at trial was that the September 2017 agreement terminated when they fired the plaintiff on March 18th of 2018,  The court was convinced by the plaintiff's theory of the case that the conversation, the e-mails in April, that there was no termination, that there was an offer to not sell that the plaintiff accepted by taking less money, which he memorialized in the April 2018 e-mails. So, therefore, that was a modification of the party's agreement, which continued thereafter infinitely or indefinitely. Do you see a distinction between a termination of an agreement versus a termination of employment of the plaintiff? Certainly. A termination of the contract would be when there are, there's nothing left to do. So, I mean, I guess they would go hand in hand. In this instance, there were still things to do because of the commissions that had been bargained for in the original contract. So, if I understand correctly, Your Honor is interpreting the September 2017 contract to entitle him to commissions for work in the future even if he was not doing work for the company. No, he was to get trailing commissions on any relationships he introduced to the company. That was part of the agreed upon contract, wasn't it? The testimony on that was, I'm sorry, I can find it for you. This happens in, gosh, all kinds of employment situations, even lawyers. When they leave the law firm, they've been terminated from the law firm, but if they brought a client, like a plaintiff, personal injury case, they still get their cut after they've been terminated, right? They get their maybe one-third of the one-third? Yes. So, we discussed this a little bit in our reply brief, which is whether or not he would be entitled to commissions in perpetuity if, in the event, he was terminated from the company. And both the plaintiff and SSC testified that that was not something that was even in the contemplation of the parties. The plaintiff said, it never even crossed my mind that I wouldn't be working there. He thought, he actually testified, I think in his deposition, that he thought if he worked there for a week and quit, he would still get commissions for the rest of his life. That was never part of the offer from SSC. SSC offered, if you come on board and help us build this brand and end up retiring from the company, we'll continue to pay you trailing commissions throughout your retirement for work that you did. He barely lasted five-and-a-half months. And he, so he never reached retirement. He never retired. He actually went and worked full-time for another company. I don't know if he's still working. But the notion that you would need to work up to and including your retirement to get these commissions was something that SSC believed, and the plaintiff had a completely different understanding, that he thought that by quitting his prior job and coming to work for him, that he was entitled to any sales this company made for the rest of his days. So... Your position is that the 2018 modifications are irrelevant. Here's why they're relevant. And this goes to the award of statutory damages and attorney's fees and costs. The statute at issue here, plaintiffs sued for breach of contract and under the Sales Act. Breach of contract, you have a valid enforceable contract with substantial performance, a breach and damages. He argued any alternative in his complaint, a Sales Representative Act claim. That act only applies to upon termination of a contract. Nowhere in the proceedings in this case did the plaintiff argue or did the court find that any of these contracts, whether it be the September one or the modified contract, there was no finding of a termination at all. So the number one error that we've pointed out in our appeal is whether the court, under the finding of the court, which was there was an agreement in September, it was modified in April, and it was breached at some point thereafter, whether that was subject to a violation of the Sales Act. And it cannot have been because there was no finding of termination. Indeed, Plante's closing argument said, if he didn't want the benefit of the bargain, he's fine to reject it, but that doesn't mean it ends the contract. So absent a finding of a termination of a contract, the award of statutory damages was improper. The statute cannot be more clear. We cited the, you know, the cardinal rule of statutory interpretation. What did the legislature intend? What did they write? And in this case, a violation only occurs, I mean, it's a very short statute. It's three sections. A principal who fails to comply with provisions of Section 2 concerning timely payment or any contractual provision concerning timely payment of commissions due upon termination of the contract with the sales representative. There was no finding of termination. It would have been, this is Plante's case, Plante had the burden of proof of showing a termination to trigger the act. That never happened. Without triggering the act, the award of statutory damages and fees was inappropriate or erroneous. So that's the number one error in our case that we're arguing. Can I have one question about the modifications in 2018? Sure. So what's your interpretation of Shevick's statement that there is, quote, there is an element of my discretion in all of this, end of quote? Mr. Shevick testified that I asked him what he meant, and he said all of this means all of this. Whether he was going to give him credit for certain accounts, not others. You know, the previous email, as you may recall, at the bottom, Mr. Shevick, or Mr. Callanan wrote, no lawyers need to be involved. A gentleman's agreement is fine. And Mr. Shevick testified that he understood that by its dictionary definition, which was this is a handshake agreement. He testified also. And isn't that actually the rub here? Is that everything was fine until the lawyers got involved? They did all this. So with his understanding that this was, you know, an offer to give him a soft landing, he didn't wish to get harmed. It just didn't fit his brand. You know, they went to a sales show together, and they were like, he didn't like how he was representing his product. So they cut off his email. It was clunky, you know, but his understanding was, you know, this is post-termination. You know, I'll give you a little something. It's a gentleman's agreement. I retain discretion in all of this. It was gratuitous. We did argue that at trial, and we do bring that up in our briefs as well. The court disagreed, so we're here today. But just to go back to the – I wanted to talk about a couple cases where there have been courts that have analyzed whether or not the Sales Act applies to contracts that are still executory. And we cited three cases, Ferrara v. Sink, Ulrich v. Tech Air, and Converge v. Topey. And in all of those cases, the plaintiffs sued for a violation of the Sales Representative Act under contracts that were still in effect, and all three courts rejected it, saying no. Clearly, what the statute says is that it governs commissions that are due after – upon and after termination of a contract. And where there's no proof or allegation that the contract's been terminated, the act is inapplicable. So they're not entitled to statutory damages. In each of those cases, though, they said you are entitled to bring a breach of contract claim, which the plaintiff also did in this case. So you only have some time for rebuttal, but if you could sum up. I can stop here. Okay.  No.  All right.  Thank you. Good morning, Your Honor. May it please the Court. Beginning to beginning, as they say. In September of 2017, Kevin Kellenand was in his late 60s, had been employed as a latex salesman for 30 years,  had no experience in the business world at all, coming in. He had sold products to defendants for a long period of time. And based on that relationship, Kevin Shevick – or Carl Shevick, excuse me, the defendant CEO in this action decided he wanted to open up a wholesale brand for Earth Foam, this product, because of Kevin Kellenand. That's why they entered into this agreement in September of 2017, which, to Justice Reyes, your question about terminable at will, our position in the trial court is that it was a contract for a specified term. If we look at the language of those emails, it is, here's what's going to happen in year one, here's what's going to happen in year two, here's what's going to happen after year two retirement to ATBD. It was a contract for a specified term. It was not terminable at will, so that when the trial court found in April, March and April of 2018, that Mr. Shevick wanted to terminate that relationship, that he couldn't do it on his own. He needed the agreement of Kevin Kellenand to do that and to modify the contract. Contrary to counsel's suggestion, and it has been pervasive through the entire proceedings, there are not two separate agreements. The trial court in this case found there is one contract that was modified. There is no question, and counsel admitted today again, that that September 2017 contract between the parties is a contract governed by the Illinois Sales Representative Act. They acted the principle. They acted as a sales rep. There's payment for commissions, and payment for commissions that were due off into the future based on work that he had already performed. Well, what about the emails where they're even agreeing that, you know, we haven't worked out all the details, you know, all the terms here. This sounds more like negotiations than a contract, right? In September 2017? No. The details that were left unresolved were two things. One is, well, they were on issues that were not germane to starting the performance. Okay, so there were some subspecialty products that Mr. Shevick had said, I haven't figured out how to price this yet, so I don't know what I want to pay you on commission. Wasn't that the phrase about the 5% on topper-slash-for-sales-hand related other products yet? Correct, sir. Related other products. And again, if you look at that email, he actually goes and defines what he means by related products. So it's not actually as indefinite as counsel wants to suggest. But the testimony in the case is that that issue never came up, and it was not any part of the damages that were ever sought. So in terms of is there, you know, was Judge Schneider's finding of fact that there was a clear and enforceable terms sufficient for enforcement, was that against the manifest way? No. There was an offer, clear, promise, clear, and then they performed. They performed from October 1st of 2017 all the way through the end of March of 2018 into April of 2018. So we have offer except the performance. So there's no indeterminacy. The finding of fact was not against the manifest way of the evidence. The hiccup that counsel tries to inject into this case is about that modification and trying to claim again that it's a separate agreement as if they were strangers to each other, starting a new relationship. The essence of that modification is that it was not about how to begin a new relationship. It was about how to terminate the relationship that already existed. And that, they've admitted, was a relationship that was a sales representative principle relationship. And in terms of counsel's, I think she said today, her number one argument on appeal, this is the argument that we addressed in our brief, is waived. It has never been brought before until this appellate position. It was not brought in the motions to dismiss, which they lost. It was not brought in the arbitration, which they lost. It was not brought in the motion for summary judgment, which they lost. It was not brought up ever in trial. And one thing I want the Court to make clear, counsel in her reply brief had tried to argue that she had brought it up in her post-trial motions and submitted a block quote to Your Honors from 876 that cited lines 3 through 12 where she addressed the statute. There's no question she addressed the statute. It was always that the statute didn't apply because, according to counsel, there was this new agreement that she just refused to accept. There was only one contract. She never once, counsel never once, the defendant has never once in this case until appellate court, argued that the contract lives on to this day. And, in fact, she cuts her block quote off at line 12, and she conveniently doesn't tell you about line 13 in which she says to Judge Snyder, and in this case the termination of that relationship with the sales representative occurred when the parties entered into the modification. So, if anything, she argued that, in fact, had ended. And if we look at the facts of the case, Judge Snyder's findings were well supported in the evidence. We had pled in our complaint that defendant had repudiated that contract, had breached that contract through its failure to pay, and those are the findings that Judge Snyder made his rulings on and based the damages on. Waiver is applicable here not only because now we're finding, yet again, a new argument from defense counsel about why they should be able to avoid the promises that they made to Mr. Callinan, but because if she had brought it up to the trial court, Judge Snyder could have easily clarified for her at the time, no, I found that this contract terminated with a modification, and this is just about the responsibilities of the commissions that are due off into the future, to Your Honor's point, of trailing commissions based on work that had already been done, and done presumably to the sales representative. So then what's your interpretation of Chevick's statement that, quote, there is an element of my discretion in all of this, end of quote? Sure. And as the trial court made a finding of fact on that, Your Honor, that one relates only to the selection of customers. If we recall the events that occurred, they attend a trade convention show, the ISPA show. Mind you, Mr. Chevick never once raised any complaint to Mr. Callinan about the performance. In fact, he was very happy about the performance at the number of customers, new customers that were being driven in at that convention. So this e-mail is about, I'm going to tell you which customers, and use my discretion about whether or not you did enough to bring those customers to the table to generate future revenue for us, and I'll pay you those commissions on it. If we look at the structure of that document, it starts off, the very first line, it's in response to Mr. Callinan. Mr. Callinan writes an e-mail and says, please confirm that the consulting payments are going to continue through September of 2018. The first line of Mr. Chevick's e-mail, yes, this will continue through September of 2018. The next line of Mr. Callinan's e-mail is in about the commissions. It's when does the 5% apply, how long will it apply, and is the 2% part of your thinking? The next response from Mr. Chevick is about those commission percentages. And it's in that body that he then says, I will go to the ISPA show list and select those customers that you should be getting credit for on those future revenue sales that are going to be generated from your past work, and that is how I will use my discretion, and I will be fair. He says, if somebody just kind of happened to wander into our booth, I'm not going to give you credit for that. But if you talk to them and you convince them that we should be doing earth foam, I'll give you credit for that. That's what your Honor, the discretion is about. That is exactly what Judge Snyder found, and there is no basis to argue that it's against the manifest way of the evidence in this case. There's a big elephant in the room. It's about the attorney fee. That's where the big dollar number comes here, right? Sure. Why should the attorney fee include services for dismissed counts and like the non-Sales Act count? I'll break it down into two pieces. As to dismissed counts, it doesn't. We submitted a very detailed fee petition that had line-by-line work items, and we struck through the work that related specifically to counts two, which was an IWPCA count. We struck through and eliminated those from our petition. So in that respect, it doesn't. If your Honor's question is, why should it relate to the contract, the breach of contract work, it is because in order to prove a Sales Act violation, you have to prove an underlying contract. There's a good quote from the AA Sales v. Conoceal case at Seventh Circuit, but it says the ISRA is parasitic to a breach of contract. Unless you conform, and you look at the language of ISRA itself, it says there has to be a contract. So because it's so intertwined with the elements that have to be proven, then you should be able to recover for both of those, work on both of those counts. That's exactly right. It's the same work. Proving the breach of contract. Proving the existence of the contract and the breach of the contract is part and parcel of the ISRA claim as well. You can't differentiate those work. The only basis that we need to look at is in terms of the agreement regarding the attorney's fees? I'm sorry, Your Honor. Is that the sole basis that we need to look at in terms of determining the attorney's fees in this case? I don't think that's the sole basis. The standard of review for Your Honors is abuse of discretion. Did Judge Snyder abuse his discretion in making that determination? And I would point out to Your Honors that Judge Snyder offered an evidentiary hearing in this case on the fee petitions. My office submitted my affidavit both as to my past work, my time involved in the case, and my hourly rate. I submitted affidavits from other lawyers who have done similar work in the field who test, who swore on the affidavit that the time spent was reasonable. And defendant offered no evidence at all at the evidentiary hearing. Didn't offer their own time bills to suggest that my time was out of line. Didn't offer a counter affidavit to either say the hourly rate or the time spent was inappropriate. Which is like the lodestar method, right? It is a lodestar method, Judge. And that's what you submitted because the contract, the attorney-client contract, which was, I think, entered after the attorney-client relationship began, right? The sort of revised contract said it could be a third of the recovery or it could be based on reasonable attorney's fees. It could be based upon what the recovery might be from ISRA, et cetera. I'm sorry. There were several different methods that you included for, like, what the judge might award. You included that as well in the language. In the language of the amendment. Because you're kind of arguing you should, you know, if you're going to get ISRA fees, it should be based only upon the, like, one-third portion of that attorney-client agreement. But that was the argument, and that was the argument that Judge Steiner rejected. I also think that's fitting with the purpose behind the statute itself. The purpose behind the statute is to make sure that these salesmen, even when the commission numbers are low, have an opportunity to get paid on them and they can't be leveraged out of it. This case is a great example of that. Mr. Keonan did his best to try to pay me by the hour to begin. It became too much for him. And it became too much because of the way defendants litigated this case. If Your Honors will look at it, we spent some time with some care and a few petition outlining to Judge Steiner that we took a lot of care. Everything that we did was responsive to the defendants. Filed a motion to dismiss. We had to respond to that. We got ordered into arbitration. I didn't ask for arbitration. The court sent me to arbitration. We go to arbitration. We're successful in arbitration. We win. So we have to do that. Defendants come out of the arbitration having a finder of fact just decide against them and thought it was appropriate to file a motion for summary judgment. I've got to respond to that. We go to the trial. They lose. They have post-trial arguments. I have to respond to that. Everything that my office has done has been in response to that. And this is the purpose of the ISRA statute in that attorney's fee position, that we should be allowing. Otherwise, this gentleman, Mr. Callahan, in his late 60s, who's now in his 70s, has no access to the courts. He can't serve. So if I understand this correctly, there was an evidentiary hearing at the trial court level, right, regarding the fees? Yes, Your Honor. And it was a determination that they were fair and reasonable? That's correct, Your Honor. We stuck some money out of the fee petition. And there was an arbitration to determine the attorney fees again, and the arbitrator found that they were fair and reasonable? No. At the hearing, the arbitration came earlier. We were a quarter of the way around. Yeah, right. I'm sorry. Coming out of that, motion for summary judgment, full trial, then the fee petition after that. But yet they're still contending that the fees are excessive? They are. Okay. And, again, our position is the award in this case is responsive to all of the work that we've had to do. It was absolutely necessary. There's no abuse of discretion from Judge Snyder in making that finding. He recounted in his opinion all of the arguments that everybody had made, both sides had made. He recounted the appropriate factors that would need to be considered, and he made his judgment. He cut the fees a little bit, but otherwise left it intact, because the defendant submitted absolutely nothing in that regard. Any other questions? I'm sorry? What's your request? My request is based on the arguments in the appellate briefs, Your Honor, that this case be remanded and affirmed in full and the mandate issued back to the circuit court so that we can finally get Mr. Callinan paid into his 70s now. Okay.  Any other questions? Okay. Thank you very much, counsel. And Rebecca? A couple of things to touch on. I believe I heard counsel say the modification was the party's efforts to terminate their relationship as sales representative, well, as I understood it to continue, as sales representative and principal. That's exactly what I was saying, that the terms of the modification extinguished that relationship which would mean the modified contract that resulted from that is not subject to the Sales Representative Act because these are not principal and agent. It's not a contract contemplating the sales of products. In fact, it was, if you think of it this way, what would the plaintiff have to do to substantially perform under that contract? And the answer is nothing. He was to provide the service of doing nothing. There's myriad case law that says service contracts aren't governed by the Sales Act. It has to contemplate the sale of products. So the modification, as I understand him, extinguished the sales representative-principal relationship. So the resulting contract, which is what they put in the law that I quoted earlier, says you have to bring a lawsuit on the modified contract. So you don't get to claim we're still sales representative and principal as we were in September 2017 when we agreed in April 2018 you're no longer going to sale for me. And you went and got a job somewhere else in exchange for this money. Whatever money that was, if you want to call it capital C commissions, lower C commissions, the relationship was extinguished and it can't be subject to the Sales Act. But isn't the whole objection of ISRA to make sure that trailing commissions get paid to their sales rep upon the termination of a contract? It says that in black and white three times in the statute. Cases have interpreted ISRA as only applying to commissions arising upon or after the termination of a contract. So as plaintiff's counsel just testified, he had the obligation to prove that there was an underlying contract in order to reach the ISRA damages. That's not all. He had the burden of proving not only was there an underlying contract, but that contract terminated sufficiently to trigger the statute. Statute says in both sections two and three, it only governs commissions due upon termination of a contract. There was no evidence at trial that the contract terminated. We didn't hear him say it here today that the contract terminated. And it was his burden to show that it did sufficiently trigger the statute. If you look at Judge Schneider's ruling, he never addressed that issue or even the concept. He just said, oh, it looks like this has to do with commissions, so the Sales Act applied. He never addressed the termination provision or the fact that it had to be triggered by termination. And specifically to the waiver argument on record page 876, I brought that up to the court expressly. I said the important language is that the damages are focused on the commissions that were due upon the termination of a contract with a sales representative. Our entire theme throughout this whole case was this was simply a breach of contract case. It involved $3,700 in commissions. The elephant in the room was that the attorneys, the demand for attorney's fees drove this thing all the way through trial to now. And it has always been SSC's position that this was not a case subject to the statute. There was no termination of a contract found in the trial court. The plaintiff did never claim that there was a termination of the contract. The court never found there was a termination of the contract. Yet the statute expressly states that that's the triggering mechanism for the contract. So the award of statutory damages and a violation of Section 3 of the statute was an erroneous ruling by the trial court, absent a finding that there was a termination. Had there been any inkling of it, plaintiff's counsel would have stood up here and directed you to where in the record that appeared. And it doesn't because he can't. What about the issues of the attorney's fees? You contend that they're excessive, yet there was an arbitration hearing. It determined that they were not. And then the trial judge had an evidentiary hearing and made a similar determination that they were fair and reasonable. We did make that point, Your Honor. And I think you pointed out the language that would entitle them to the fees that were given. And, no, we didn't object at that point. But our main focus and the thrust of it was my first point, that the entire award of statutory damages was inappropriate. It was an error because there wasn't a termination of the contract determined at trial. So if the court is persuaded on that point, the entire attorney's fees issue becomes moot because the award was contrary to the statute under the facts of this case. And do I have any more time or should I? Any questions? If you want to sum up, you're welcome to do so. Sure. I'll just reiterate. The courts are obligated to apply statutes as written. The issue is clear in Sections 2 and 3, that it only comes into play upon termination of a contract. There's no termination of a contract found in this case. So the statutory damages and fees were awarded in error, and that portion of the court's ruling should be vacated. As to the breach of contract claim, we do maintain that the terms of the contract were not sufficiently clear. There was no meeting of the minds. We describe that in our brief actual testimony as to what the parties thought they were agreeing to, and then the court interjected entirely different terms in his interpretation of the contract. So we would argue that there was no breach of contract because there was no meeting of the minds. But the more essential point is that the judgment under the ISRA was unwarranted because there was no proof of termination of a contract as required to trigger the statute. Any requests? To vacate the court's ruling, or to vacate the award of statutory fees and costs under Section 3 of the Illinois Sales Representative Act. Thank you. Thank you very much. I want to thank counsels for a well-argued matter and an interesting issue, and we're going to take a short break to let the next case set up and get ready to proceed. Court is adjourned.